HASBRO, INC., Plaintiff–Appellant,

v.

LANARD TOYS, LTD.,
Defendant–Appellee.

No. 799, Docket 87–9037.

United States Court of Appeals,
Second Circuit.

Argued Feb. 8, 1988.
Decided Sept. 15, 1988.

9999999999

Kim J. Landsman, New York City (Anthony M. Radice, Debra Freeman, Morrison & Foerster, New York City, of counsel), for plaintiff-appellant.

Russell H. Falconer, New York City (Thomas R. Nesbitt, Jr., Parker H. Bagley, Brumbaugh, Graves, Donohue & Raymond, New York City, of counsel), for defendant-appellee.

Before CARDAMONE and PIERCE, Circuit Judges, and STANTON, District Judge.*

CARDAMONE, Circuit Judge:

This appeal brings before us a dispute between two toy manufacturers. It is focused on toy figures enclosed in plastic bubbles whose descriptions on the cardboard backing to which they are attached make them the toughest "characters" ever to appear in court. Legal combat regarding the use of a trademark has engaged two manufacturers of military action figures, appellant Hasbro, Inc., and appellee Lanard, Ltd., the manufacturer of current combat action figures. The outcome of this litigation cannot be determined by pitting "Large Sarge," a member of Lanard's "GUNG-HO!" line of figures, with his bazooka and ability to be "[e]xtremely cool and competent under deadly pressure ... [and] to formulate strategy revisions in the heat of battle," against Hasbro's "GUNG-HO" action figure, with his dress sabre and ability to "low-crawl through the nastiest black-water, stinking mud and bubbling slime."

Instead, familiar tests to determine whether Hasbro's unregistered mark is protectible under the Lanham Act, to assess its strength, and to evaluate the likelihood of confusion decide the outcome of this expedited appeal from a denial of Hasbro's request for a preliminary injunction. Based on our conclusions that the mark "GUNG-HO" is suggestive and that there is a likelihood of confusion, the order denying a preliminary injunction is reversed.

## BACKGROUND

Hasbro, incorporated in Rhode Island, is the world's largest toy manufacturing company with 1986 revenues of over $1.3 billion. Since 1982 it has produced and marketed for retail sale a line of 3¾ inch poseable military figures under the trademark "G.I. JOE". The "G.I. JOE" line consists in part of individual characters— originally nine and now 34—each with his or her own real name, code name, uniform, military specialty, biography, and personality. These figures retailing at $2.80 to $5 are sold everywhere in retail toy, department and other stores aimed toward children aged four through 14.

From 1983 to 1985 Hasbro introduced into the "G.I. JOE" line "Ettienne R. LaFitte"—code name "GUNG-HO"—a barechested tattooed marine with a machine gun and backpack. Although in 1986 "GUNG-HO" was removed from the action figure series, Hasbro continued to promote the character in 1986 through licensing it in, for example, comic books, book cover illustrations, and album covers, and delivered to its retail accounts leftover inventory of those figures from the previous years' production.

Hasbro reintroduced "GUNG HO" in its 1987 "G.I. JOE" action figure series. The 1987 figure, distinct from the earlier one, appeared in full dress marine uniform. The character's real name—"Etienne R. La

Fitte"—and code name remained the same as before (except for two insignificant spelling changes in the real name), but the location and size of the name "GUNG–HO" changed on the packaging. On the 1987 packaging, the code name appears in ¼ inch lettering above the character description, "MARINE DRESS BLUES," which appears in 1/16 inch lettering. On the back side of the plastic blister packaging, the code name appears prominently on the filecard size biography and beneath the postage-stamp size illustration of the character.

Since 1983 Hasbro has spent over $65 million to promote its "G.I. JOE" line. Because it does not advertise single characters it cannot specify what portion of that amount can be attributed specifically to promoting the "GUNG HO" character. Sales of the "G.I. JOE" line in 1986 amounted to $170 million, approximately 13 percent of Hasbro's total sales for that year. "GUNG HO" was a top seller in the 1983–85 line. In 1983, 1,250,000 figures were shipped, and it has shipped close to two million of them since 1983.

Defendant Lanard, incorporated in Hong Kong, had 1986 sales in the United States of $10 million. In May 1986 it commissioned a toy designer to create a toy product to compete with Remco and other toy companies in the secondary toy market for military-style action figures. According to the designer, Lanard and other toy companies tap the secondary market by avoiding promotional costs and producing toys on a per order basis, thus creating a price differential between their products and higher priced but otherwise similar, or even interchangeable, toys produced by Hasbro and other companies in the primary market. The designer—who suggested the name of "GUNG–HO!" for the new project—worked on the development of the figure line from May until December 1986. He was aware of the "G.I. JOE" line and its popularity and had in his possession and used for reference during the design stage Hasbro's "G.I. JOE" packaging and its 1983, 1984 and 1985 catalogues.

In October 1986, Lanard's trademark counsel conducted a search which revealed no prior use of the term "Gung Ho" as a federally registered trademark in the toy industry. Lanard introduced its "GUNG–HO!" line—12 action figures and two vehicles—in its January 1987 catalogue, and at the February 1987 New York Toy Fair displayed the line in its New York City showroom. Lanard's first shipment to the United States occurred on January 27, 1987.

Like Hasbro's "G.I. JOE" action figures, Lanard's figures are 3¾ inch plastic action figures with jointed arms and legs. Each figure has its own name and biography. Lanard's blister-card packaging, target market, and sales to stores are similar in many respects to Hasbro's. The retail price of its figures is $1.50 to $4.00 each, slightly below the range of prices for Hasbro's "G.I. JOE" figures. Further, on Lanard's packaging for its vehicle accessories, Lanard states that the accessories are "[f]or use with all 3¾" action figures including "GUNG HO!" TM, "G.I. JOE" TM, and "AMERICAN DEFENDER" TM [a Remco product]."

The magistrate found that Lanard has not advertised, marketed, or promoted its "GUNG–HO!" line apart from the 1987 catalogue and the February 1987 Toy Fair display, and has spent little on research and development apart from the fee paid its designer. Lanard estimates its expenditures for packaging the line at approximately $200,000. As of the parties' last submissions to the magistrate, Lanard had shipped in 1987 over $350,000 (retail value) of this line, which represents almost four percent of its total sales.

On August 20, 1987 Hasbro commenced the instant action in the New York State Supreme Court (New York County), alleging common law unfair competition. On August 26 Lanard successfully petitioned for the action to be removed to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1441 (1982). Hasbro subsequently amended its complaint without objection to assert a claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982). In October 1987, after referral upon stipulation of the

parties to Magistrate Buchwald, approved by the district court (Duffy, J.), the magistrate held a hearing on the motion for a preliminary injunction. In an opinion rendered on November 18, 1987 the magistrate denied Hasbro's motion. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 87 Civ. 6214 (S.D.N.Y. Nov. 18, 1987). Hasbro brought this expedited interlocutory appeal as of right pursuant to 28 U.S.C. § 1292(a)(1) (1982). We reverse.

## DISCUSSION

In order to obtain a preliminary injunction, Hasbro must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see Warner Bros. v. Gay Toys, Inc.*, 658 F.2d 76, 78–79 (2d Cir.1981) (*Jackson Dairy* standard applies in trademark infringement cases). In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm, *see Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987); *Standard & Poor's Corp. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir.1982); *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971), assuming that the plaintiff has a protectible mark.

## I  *Protectibility of Hasbro's Mark*

The first question to be resolved is whether Hasbro's unregistered mark is entitled to protection under the Lanham Act. The four categories that measure the degree of protection a mark merits are, in ascending order of protection, generic, descriptive, suggestive, and arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). The central issue on this appeal is whether Hasbro's "GUNG–HO" is a descriptive or suggestive mark.

"A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968), *quoted in Abercrombie & Fitch*, 537 F.2d at 11. Generally, if a term is suggestive it is entitled to trademark protection without proof of secondary meaning, *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 216 (2d Cir.1985), and recognition as a strong mark.

"A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods," *Stix Products*, 295 F.Supp. at 488, *quoted in Abercrombie & Fitch*, 537 F.2d at 11, or if it "describe[s] the use to which a product is put," *Thompson Medical Co.*, 753 F.2d at 216; *see Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985); *see also 20th Century Wear, Inc. v. Sanmark–Stardust Inc.*, 747 F.2d 81, 87 (2d Cir.1984) (adopting the *Stix Products* test), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1755, 84 L.Ed.2d 818 (1985). Generally, an unregistered descriptive mark is only accorded trademark protection when secondary meaning is established, *Thompson Medical Co.*, 753 F.2d at 216; *see 20th Century Wear*, 747 F.2d at 87, and is a weak mark.

Applying the *Stix Products* test, the magistrate concluded that "[f]or a mark to be descriptive it is not necessary that simply upon its utterance the listener knows what the product is; he must only recognize its characteristics." Because the term "GUNG–HO" invokes some recognition in consumers of the qualities of Hasbro's marine action figure, the magistrate held that as applied to Hasbro's product "GUNG–HO" is descriptive.

Hasbro and Lanard agree essentially as to the etymology and current common meaning of "gung ho." The term which a Marine colonel misunderstood to mean "work together," is a transliterated abbreviation for Chinese Industrial Cooperatives Society. *See Webster's Third New Inter-*

*national Dictionary* 1012 (1986). During World War II the United States Marines adopted this phrase as a motto. Hasbro contends that current usage shows no connection between "gung ho" and the United States Marine Corps or the Chinese origins of the expression. It maintains that "gung ho" today means "enthusiastic," "cooperative," "enterprising," or "very zealous." Lanard believes that the term originated as a motto for World War II marine raiders and that it presently means aggressive, extremely zealous, and enthusiastic. The parties' definitions of the term's meaning are nearly identical.

The critical legal inquiry remains unanswered by this consensus because the etymology, general usage, and common meaning of a phrase are of limited relevance in characterizing it for Lanham Act purposes. The Act is aimed to protect purchasers in the marketplace, and it is their perception that determines whether a mark is descriptive or suggestive. *Thompson Medical Co.*, 753 F.2d at 213. Thus, it is the interplay between the meaning of the words comprising the mark, the product itself, and the thought processes attributed to the purchasing public that must be examined in order to resolve whether an expression is descriptive or suggestive.

The parties also agree that "GUNG–HO" conveys an impression of some of the characteristics of the fantasy persona created for that marine action figure. As Hasbro emphasizes, some of these characteristics are common to all the figures in its "G.I. JOE" line. But the parties disagree sharply regarding the legal analysis that applies when the term evokes directly the fantasy aspect of a product rather than, as *Stix Products* notes, the qualities or characteristics of the goods themselves. *See 20th Century Wear*, 747 F.2d at 87–88. The magistrate assumed that an expression that conveyed an immediate idea of the characteristics of a fantasy persona is legally analogous to one that makes known the characteristics of the goods. We disagree with the magistrate's conclusion regarding Hasbro's mark because an examination of marks held to be suggestive ar-

gues persuasively that "GUNG–HO" is a suggestive mark.

An illuminating explanation of the difference between a descriptive mark that conveys an idea of the characteristics of the product and a suggestive one that requires imagination to divine the nature of the product is that if "there is an imaginative factor connecting the name and the product; [if] one suggests the other, but without describing it," then the name is suggestive. *Information Clearing House, Inc. v. Find Magazine*, 492 F.Supp. 147, 156 (S.D. N.Y.1980) (Weinfeld, J.) ("Find" may suggest a variety of items or services but does not describe any one of them); *see also Or Da Indus., Ltd. v. Leisure Learning Prods., Inc.*, 479 F.Supp. 710, 715 (S.D.N.Y. 1979) ("BRAINY BLOCKS" suggestive of game with geometric tile pieces resembling blocks that requires a child's cognitive skills).

Recently, we affirmed a finding that "FORTIFLEX"—a conjunction of "fortify" and "flexible"—used in the sale of plastic resin is "suggestive of the nature of [Soltex's] goods" and thus is a suggestive and strong mark. *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1328 (2d Cir.1987). Obviously, it takes imagination to conjure the image of plastic resin from the term "FORTIFLEX," despite its descriptive element. In the publishing field, the term "PLAYBOY" is a suggestive term, and even though it "may signify the aspirations of PLAYBOY's readership, it does not describe the product or its contents." *Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563, 566–67 (2d Cir.1982). In another context, "PASSION" used for a perfume was held a suggestive mark, since "[i]nstead of describing the product, it describes an emotion the fragrance seeks to induce. Connecting the emotion to the fragrance requires 'an effort of the imagination.'" *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.*, 673 F.Supp. 1238, 1243–44 (S.D.N.Y.1987).

Just as PLAYBOY's readers may desire to devote their time to "leisure, self-amusement, and hedonistic pleasures," *Playboy*,

687 F.2d at 566, the marine action figure might—in his fantasy personality—strive to be aggressive and zealous. Hence, a certain amount of creative imagination is required under both marketing circumstances, either on the part of the magazine reader or action figure purchaser. It takes some imagination even for a child to intuit a swamp-crawling, leech-sucked, bug-bitten marine Sergeant from the term "GUNG-HO." The most that the term might immediately convey is the idea of toy figures with ambitious, zealous, and aggressive personalities. These characteristics are common to all the figures in Hasbro's "G.I. JOE" line and, by definition, all of Lanard's "GUNG-HO!" figures. Without further prompting, a consumer would be hard-pressed to connect immediately "GUNG-HO" with a marine as opposed to an arctic trooper, helicopter assault trooper, or laser rifle trooper, all of whom appeared in Hasbro's 1983-1985 line of action figures, even if a toy action figure immediately suggests itself in the first place.

We agree with the magistrate that the baseline inquiry concerns "how immediate and direct the thought process is from the mark to the particular characteristic of the goods." Lanard does not suggest that a parent or child confronted with the term "GUNG-HO" would immediately sense the quality or characteristics of the actual Hasbro marine action figure in the manner that Chapstick, Bufferin, and Holiday Inn—all descriptive marks—directly suggest the relevant products. The critical legal distinction is that the mark "GUNG-HO" may describe elements of the personality attributed to the toy, as well as other toys, without describing the particular toy itself or its differentiating qualities. Connecting the fantasy personality to the toy action figure requires imagination. And, quite simply, it is this need to resort to imagination that renders "GUNG-HO" suggestive rather than descriptive. Thus, we hold that "GUNG-HO" as used by Hasbro on its marine action figure as part of the "G.I. JOE" line is a suggestive mark.

## II Likelihood of Confusion

Having decided that Hasbro's mark is suggestive, it follows that it is protectible without proof of secondary meaning. We turn therefore to the critical inquiry in this case: whether as a result of Lanard's sale of "GUNG-HO!" action figures "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In order to determine whether such a "likelihood of confusion" exists we apply the test enumerated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This multifactor balancing test includes consideration of

> the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495; *see Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1225 (2d Cir.1987). The *Polaroid* test extends to competing as well as noncompeting products. *Thompson Medical Co.*, 753 F.2d at 214; *see Banff Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir.1988). Additionally, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product," *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986), and "the court may have to take still other variables into account," *Polaroid*, 287 F.2d at 495.

In reviewing the magistrate's determinations as to the *Polaroid* factors, "each specific finding is subject to a clearly erroneous standard, but the ultimate determination of the likelihood of confusion is a

legal issue subject to *de novo* appellate review." *Banff,* 841 F.2d at 490; *see Centaur Communications,* 830 F.2d at 1225; *Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004–05 (2d Cir.1983).

## A. Strength of the Mark

■ The first *Polaroid* factor, the strength of the senior user's mark, is the mark's "tendency to identify the goods sold under the mark as emanating from a particular ... source." *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). The fact that the mark is suggestive is not necessarily controlling on the issue of its strength. *See Centaur Communications,* 830 F.2d at 1225–26. Instead, "the strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor–Doniger,* 599 F.2d at 1131. Other factors may be considered in this determination. But the mark's strength must be "examined in its commercial context." *Centaur Communications,* 830 F.2d at 1226. Here, we think the previous discussion holding the mark suggestive demonstrates its strength as well.

Lanard raises two additional arguments which, if persuasive, would demonstrate that the term "GUNG–HO" as used by Hasbro does not warrant a finding that it is a strong mark, regardless of the fact that it is suggestive. First, Lanard argues that Hasbro has not established that the designation of "GUNG–HO" as a code name for its marine action figure is used as a trademark, that is, that it functions as a trademark to "identify and distinguish" Hasbro's figure "from those manufactured or sold by others ... [in a manner that] indicate[s] the source of the goods." 15 U.S.C. § 1127 (Supp. IV 1986). Second, Lanard asserts that proof of secondary meaning is relevant in this case to determining whether this suggestive mark is a strong mark in its commercial context.

We turn to Lanard's first argument that Hasbro's "Gung–Ho" does not function as a trademark. This arguments is part of Lanard's claim that the code name of each of Hasbro's characters in the "G.I. JOE" line is simply a "style designation" that ought to be accorded status as a strong mark only if secondary meaning is established. For this proposition, Lanard relies primarily on *Clairol Inc. v. Gillette Co.,* 389 F.2d 264 (2d Cir.1968). That case concerned Clairol's use of "Innocent Ivory" to describe one of a number of shades in its "Born Blonde" line of hair colors and "Innocent Beige" as the name of one of its hair rinse shades in the "Picture Perfect Instant Color Rinses" line. *Id.* at 266. These fanciful names were deemed marks indicative of color, not of origin, and as such were ineligible for protection without proof of secondary meaning. *Id.* at 271.

This case is different than *Clairol* which considered only whether marks designating color merited trademark protection. *Id.* at 270. It did not decide whether grade or style designations intended to serve as trademarks would receive protection. *Id.* In fact, we expressed "serious doubts as to whether color marks are as capable of indicating origin as are style and grade marks." *Id.* Hence, reliance on *Clairol* is not helpful to Lanard.

Lanard's position is further weakened by the fact that its own witnesses testified that the names of individual toys within a unified line of toys are treated within the industry as trademarks. Even assuming that style or grade designations—even fanciful ones—might not serve as marks because they do not indicate that "the public is motivated to buy the product because of its source," *Clairol,* 389 F.2d at 271, we are disinclined to label "GUNG–HO" merely a style designation. Lanard presents no evidence as to exactly what a style or grade designation is in a commercial context. In common usage, style or grade usually refer to size, quantity, or quality differences among products in a line of goods.

Considering Lanard's second point, no detailed marketing data as to why children persuade parents to purchase "Crazy Legs," "Beach Head," "Zarana," or "Tunnel Rat," all figures in the "G.I. JOE" 1987 line was presented. What is apparent is that Hasbro's marketing and advertising

strategies were designed to sell "GUNG–HO," not the "MARINE" or "Etienne La Fitte," as a part of its "G.I. JOE" line and that "GUNG–HO" in fact served Hasbro's purpose of distinctly identifying its marine action figure in the marketplace. For these reasons, we reject Lanard's argument that "GUNG–HO" is not a mark at all or that its designation as a suggestive mark is irrelevant for purposes of assessing its strength in a commercial setting.

■ Lanard argues finally that even if "GUNG–HO" is a suggestive mark, it is still necessary to consider the well-known secondary meaning factors: advertising expenditures, consumer recognition studies, unsolicited media coverage, sales success, attempts to plagiarize the mark, and length and exclusivity of mark use. *See Centaur Communications*, 830 F.2d at 1222; *Thompson Medical Co.*, 753 F.2d at 217. In light of our holding that the mark is suggestive, we need not review the magistrate's findings or conclusion on the issue of secondary meaning at the preliminary injunction stage of litigation. Apart from its unpersuasive argument regarding style or model designations, Lanard offers no reason to depart from the general rule that a suggestive term is presumptively entitled to protection and recognition as a strong mark without proof of secondary meaning. *McGregor–Doniger*, 599 F.2d at 1132; *Abercrombie & Fitch*, 537 F.2d at 11.

### B.  Other *Polaroid* Factors

The remaining *Polaroid* factors to be balanced in determining the likelihood of confusion are the degree of similarity between the two marks, proximity of the products, likelihood of bridging the gap, evidence of actual confusion, the junior user's bad faith *vel non* in adopting the mark, quality of the junior user's product, and the sophistication of the relevant consumer group. *Polaroid Corp.*, 287 F.2d at 495.

It is appropriate to consider together, as did the magistrate, the second and third *Polaroid* factors. *See Centaur Communications*, 830 F.2d at 1226 (appropriate to evaluate competitive proximity with reference to the first two *Polaroid* factors). The second *Polaroid* factor is the degree of similarity between the senior (Hasbro) and junior (Lanard) users' marks. The comparison of marks is an inquiry designed to determine the "general impression conveyed to the purchasing public by the respective marks." *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir.1985). Ultimately, the crucial question is whether the similarity is likely to create confusion. *McGregor–Doniger*, 599 F.2d at 1133. The third factor addresses whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source. *See Centaur Communications*, 830 F.2d at 1226. This confusion can occur if "consumers mistakenly will assume" that one manufacturer's toys are "associated with" or "made by" the other. *Lois Sportswear*, 799 F.2d at 874.

The marks themselves, Hasbro's "GUNG–HO" and Lanard's "GUNG–HO!," are virtually identical. But, Hasbro uses its mark on one individual modern army action figure, whereas Lanard uses its mark on an entire line of international security force action figures. Both display on the top front of their packaging the product line names, "G.I. JOE" and "GUNG–HO!," respectively, in 1½ inch stylized block letters, with other identifying information pertaining to the line or to individual action figures displayed in smaller letters and in less prominent places. The "GUNG–HO" code name on Hasbro's packaging appears in smaller (¼"), yet prominent, type above the figure itself. Thus, while the marks appear strikingly similar, they function differently in promoting the sales of their respective products.

With respect to the third factor, there is indisputable competitive proximity. Both products are 3¾ inch military action figures, sold side-by-side (many retail stores carry both lines), compete for the identical market, and appear in similar packaging. In addition, Lanard's international security force figures are designed to be compatible in play and warfare with Hasbro's "G.I. JOE" (good guys) and "COBRA" team (bad guys) figures. Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity.

The magistrate concluded that the different uses to which Hasbro and Lanard employ the mark alleviates the likelihood of confusion that would otherwise result from the similarity of the marks and their competitive proximity. We disagree. As a practical matter, a parent sent to a store to purchase a Hasbro "GUNG–HO" action figure might be confused precisely by the similar marks appearing on products displayed side-by-side. As a legal matter, we cannot accept the conclusion that would inevitably follow from the magistrate's reasoning, which is that Lanard could use "G.I. JOE" as a code name for one of its individual figures and place "G.I. JOE" in its line along with "Shark," "Flashfire," and "Boomerang Billy." For these reasons, we hold that the similarity of the marks and their competitive proximity tend to create a strong likelihood of confusion. The magistrate's findings to the contrary on these two factors were clearly erroneous.

■ The fourth *Polaroid* factor, the likelihood that the senior user of the mark will bridge the gap by entering the market in which the junior user operates, also favors Hasbro. Although the magistrate considered this factor irrelevant because both users operate in the same market, this very fact indicates that a greater likelihood of confusion exists than if they operated in different markets.

■ The fifth *Polaroid* factor, evidence of actual confusion, is not disputed. Hasbro did not introduce any evidence of actual consumer confusion. Although such evidence is not necessary to show likelihood of confusion, *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661–62 (2d Cir.1970), its lack may under some circumstances be used against a plaintiff, *see McGregor–Doniger*, 599 F.2d at 1136. The magistrate properly declined to make any negative inference from Hasbro's lack of such evidence in light of the short time Lanard's product has been on the market. Thus, as the magistrate found, this factor "neither helps nor hurts" Hasbro's case.

■ The sixth *Polaroid* factor, the junior user's bad faith *vel non* in adopting the mark, involves hotly contested facts concerning Lanard's diligence in searching for prior uses of "gung ho" before employing it as a mark. Hasbro contends that Lanard's search confined to federally registered trademarks, a January 6, 1987 telex from Lanard's counsel to Lanard stating that "Hasbro's prior use on one figure is legally enough to stop your use on whole line of figures," and Lanard's refusal to allow Hasbro representatives in its Toyfair showroom in early 1987 demonstrate Lanard's bad faith in adopting the mark. Lanard denies these allegations and claims it first learned of Hasbro's use of "GUNG–HO" on January 6, 1987. The magistrate recognized the shortcomings of Lanard's narrow trademark search. She concluded, nevertheless, that Lanard's belief that it was the senior user and Lanard's decision to proceed with sales efforts, despite some indication that Hasbro might be a prior user, do not amount as a legal matter to bad faith. We see no reason to disturb this carefully analyzed finding.

The next factor, quality of the junior user's product, is the subject of some confusion. One view is that an inferior quality product produced by the junior user injures the senior user's reputation insofar as consumers might think that the source of the inferior product is the senior user. *See, e.g., Lois Sportswear*, 799 F.2d at 875. Another view is that a junior user's product of equal quality to a senior user's product injures the senior user by the increased tendency of similar quality products to promote consumer confusion. *See, e.g., Banff*, 841 F.2d at 492; *Centaur Communications*, 830 F.2d at 1228; *Lois Sportswear*, 799 F.2d at 875; *Plus Products*, 722 F.2d at 1006–07. Without taking sides, we do not disagree with the magistrate's unstated premise that likelihood of confusion may result from the junior user selling an inferior product. But after considering Hasbro's claims that Lanard's less expensive product is an inferior product, the magistrate concluded that Lanard's international security figures are not of lesser quality than Hasbro's military action figures. This finding is not clearly erroneous.

The final *Polaroid* factor, the sophistication of the relevant consumer group, is

grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion. *See Centaur Communications,* 830 F.2d at 1228. This is especially true when the competing products' marks are similar and the inexpensive products are in competitive proximity. The magistrate recognized that the products' price suggests that the consumers are unsophisticated, but that the total lack of evidence on this issue militates against giving this factor much, if any, weight. Despite our inclinations, similar to the magistrate's, that the relevant consumer group is unsophisticated, we agree that the lack of evidence precludes any useful conclusion on this issue.

■ We have reaffirmed the proposition that the eight enumerated *Polaroid* factors for resolving likelihood of confusion are nonexclusive. *See Centaur Communications,* 830 F.2d at 1228 n. 2; *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256 (2d Cir.1987); *McGregor-Doniger,* 599 F.2d at 1140. The senior user's delay in asserting its trademark claim is an example of a factor which, when appropriate, may also be considered in addition to the enumerated *Polaroid* factors. *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir. 1964). The magistrate considered this factor and found it helpful to discuss but unnecessary to decide in light of its holding that no likelihood of confusion exists. Because we reach a contrary conclusion, we address it briefly.

Hasbro's delay, if any, in asserting its claim commands increased attention now that we have held that its mark is suggestive. Delay, of course, tends to defeat the presumption that likelihood of confusion would cause irreparable harm pending trial. *See Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985). Yet, based on the record facts, we find no undue delay by Hasbro in discovering Lanard's use of "GUNG-HO!" or in commencing the instant action. Thus, this factor does not weigh in the balance against Hasbro.

## CONCLUSION

■ Upon review of the magistrate's findings on the enumerated *Polaroid*

factors, we hold that there is a likelihood of confusion as to source due to Lanard's use of "GUNG-HO!" on its line of action figures. The principal reason for so concluding is our characterization of the mark as suggestive rather than descriptive. Notwithstanding the lack of evidence on actual confusion and consumer sophistication, the relative strength of the mark, the degree of similarity of the marks, their indisputable competitive proximity, and the lack of any differentiation in consumer markets establish the likelihood of confusion and irreparable harm. Accordingly, the magistrate's order is reversed and the matter is remanded for the entry of a preliminary injunction in favor of Hasbro and for such further proceedings as are necessary.