**ANDY WARHOL ENTERPRISES, INC., Plaintiff,**

**v.**

**TIME INCORPORATED, Defendant.**

**No. 88 CIV. 7070 (SWK).**

United States District Court, S.D. New York.

Nov. 29, 1988.

altered as a result of information obtained through additional discovery.

Richards & O'Neill, New York City by Paul J. Hanly, Jr., Terri D. Austin, Jeffrey L. Coploff, for plaintiff.

Robin, Blecker & Daley, New York City by Albert Robin, Howard Barnaby (Robert P. Marshall, Jr., Robert T. Scherer, New York City), for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff brings this action pursuant to the Lanham Act, 15 U.S.C. § 1114 *et seq.*, New York General Business Law § 368–d and the common law of unfair competition. Presently before the Court is plaintiff's application for a preliminary injunction, following a denial of plaintiff's application for a temporary restraining order. Plaintiff, which publishes a magazine entitled *Interview*, claims that defendant's use of a section heading "Interview" in its *Time* magazine constitutes trademark infringement, false designation of origin, trademark dilution and unfair competition.

## BACKGROUND

Plaintiff Warhol Enterprises is a New York corporation wholly owned by the Estate of Andy Warhol. *Interview* magazine is wholly owned by plaintiff and is a division of that company. Affidavit of Vincent Paul Fremont, at ¶ 2. *Interview* magazine was founded in or around 1969 under the name *Andy Warhol's Interview,* and later became known as simply *Interview* magazine in or around July, 1972. *Interview* is a monthly magazine that features a lengthy central interview of a well-known person, together with shorter interviews and articles on various subjects. *Id.* at ¶¶ 4, 6. In 1987, a total of 1,723,319 copies of *Interview* were sold in the United States, 1,054,082 million of those going to subscribers. Affidavit of Lucy Lustig–Curtis, at ¶ 4. Also in 1987, 217,259 copies of the magazine were sold internationally, of which 37,748 went to subscribers. *Id.* at ¶ 5. Total revenues from sales in 1987 were $2,298,116. Various companies advertise in *Interview* magazine, and advertisements comprise approximately an average of 100 pages out of the 170 pages in each edition. Affidavit of Paige Powell, at ¶ 3. In 1987, *Interview* received $3,458,205 in advertising revenues. *Id.*

Since May 12, 1981, the trademark INTERVIEW has been registered on the Principal Register of the United States Patent and Trademark Office as trademark number 1153870 in class 16 (paper goods and printed matter). Fremont affidavit, at ¶ 4 & exh. A thereto. The INTERVIEW trademark is in script logo, with the first "i" capitalized and the other letters in small case.[1] The word "interview", all in capital letters, appears on the spine of the magazine, which is approximately one-quarter inch thick. *Id.* at P 6 and exh. C. The INTERVIEW trademark appears on the front cover of each monthly edition, and has also been used by plaintiff on various products including T-shirts, umbrellas, silk scarves, "director's" chairs and canvas bags. Powell affidavit, at ¶ 5.

*Time* is a weekly news magazine published by defendant, Time Incorporated, since 1923. *Time* currently guarantees advertisers an average net paid circulation of 4,600,000 copies sold each week in the United States and 1,330,000 sold each week internationally. Affidavit of John F. Stacks, at ¶¶ 2, 3. The magazine is subdivided into various sections, each with a short, descriptive title indicating the subject-matter of the section, such as Nation, Books, Music, and Art. *Time* has recently added a Profile and Travel section. In late September, 1988, *Time* announced that it was adding a section to be called "Interview" that would feature an interview with a personality. The name was chosen, according to defendant, "because that was the simplest, clearest title that explained what the section consists of." Stacks affidavit, at ¶ 5. Advertising space will not be sold with direct reference to the interview section, and advertisers will not know in advance who will be featured in any particular issue. Stacks affidavit, at ¶ 7.

A number of other magazines have "interview" sections. *Life* magazine, also published by defendant, has a guaranteed net paid circulation of 1,700,000 copies [2] and added an interview section in its October, 1987 issue. Affidavit of Patricia Ryan, at ¶¶ 1–3. Other periodicals, such as *USA Today, U.S. News & World Report, Omni, Challenge, Soap Opera Digest* and *Newsweek,* International Edition, have interview sections. Affidavit of Robert T. Scherer, and exhibits attached thereto.

## DISCUSSION

■ A preliminary injunction may be issued only when the party seeking relief can make "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of

---

1. The Court will refer to this stylized version as INTERVIEW, representing the registered trademark.

2. The affidavit does not specify the relevant time period, but the Court takes judicial notice of the fact that *Life* is published on a monthly basis.

hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see also Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985). This standard applies in trademark infringement and unfair competition actions. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78–79 (2d Cir.1981). To prevail on its claim, plaintiff must show a "likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Charles of the Ritz Group, Ltd. v. Quality King Distr., Inc.,* 832 F.2d 1317, 1321 (2d Cir.1987) (citing *Mushroom Makers, Inc. v. R.G. Barry, Corp.,* 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). "This showing also establishes the requisite risk of irreparable harm." *Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir.1982); *see also Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988).

■ Defendant suggests that a showing by plaintiff of likelihood of confusion or dilution would not be sufficient to establish the necessary irreparable harm, citing *Hershey Creamery Co. v. Hershey Chocolate Corp.,* 269 F.Supp. 45, 59 (S.D.N.Y.1967). Deft's Memorandum of Law at 14. The Court in *Hershey* had decided that plaintiff in that case had not shown likelihood of confusion, and then went on to say that irreparable harm cannot be alleged in conclusory fashion. This decision does not undermine the well-established proposition that a showing of likelihood of confusion in a trademark case will satisfy the irreparable harm burden for preliminary injunction purposes.

■ Defendant also argues that a preliminary injunction is not appropriate at the present time because of "undue delay" in seeking the request. *See Citibank, supra,*

756 F.2d at 276 (ten-week delay in bringing preliminary injunction action belies irreparable harm). The Court finds this argument to be without merit. Defendant publishes *Life* magazine, which also has an "interview" section, and argues that plaintiff had an obligation to sue within a reasonable time after *Life* introduced that section. While the Court will discuss below the effect on plaintiff's application that other magazines have an "interview" section, the Court does not believe that plaintiff may not seek a preliminary injunction to stop the use of the section in *Time.* *Time* only recently announced that it would add an "interview" section and began publication of this section on October 10, 1988. This application is timely.

### I. Substantial Likelihood of Success on the Merits

#### a. *Likelihood of Confusion*

■ The gravamen of a Lanham Act claim or a common law unfair competition claim is likelihood of confusion. *Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp. 1452, 1461 (S.D.N.Y. 1987).[3] In order to determine whether there is likelihood of confusion, the Court will examine the factors identified in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1960):

> the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

None of these factors is dispositive, but, considered in the context of the ultimate question of likelihood of confusion, the weighing of these factors should support the Court's determination. *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486,

---

**3.** Defendant does not contest the eligibility of the mark for protection, nor does defendant argue that the mark was wrongly registered. Since plaintiff's trademark is registered and re-

mains in force, *see* Exhibit C to the Complaint, the mark is eligible for protection under the Lanham Act. *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 212 n. 5 (2d Cir.1985).

490 (2d Cir.1988) (citations omitted). The *Polaroid* balancing test may be used in cases involving competing as well as non-competing products. *Hasbro, supra,* 858 F.2d at 75.

In this case, plaintiff claims that defendant's use of the "interview" name will result in "reverse confusion", that is, "the misimpression that the junior user [here, *Time*] is the source of the senior user's [here, *Interview's*] goods." *Id.* at 490 (citing 2 T. McCarthy, *Trademarks and Unfair Competition* § 23:1(E) (2d ed. 1984)). Reverse confusion is actionable under the Lanham Act. *Id.* at 491.

### 1. Strength of Plaintiff's Mark

"The strength of a mark is its tendency to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1225 (2d Cir.1987) (citing *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). The strength of the mark is to be "examined in its commercial context." *Hasbro, supra,* 858 F.2d at 76 (citing *Centaur Communications, supra,* 830 F.2d at 1226. "[I]n considering the strength of a magazine trademark, time and size of circulation and consumer identification are examined." *Centaur Communications, supra,* 830 F.2d at 1226. A trademark may be said to have "relative strength" if it circulates in a small market and has achieved name and origin recognition in that market. *Id.* (*Marketing Week,* in circulation a short period of time with modest sales, had "relative—if not great—strength" in its particular market).

Defendant argues that the INTERVIEW trademark is self-evidently not a very strong mark for a magazine that features an interview. Very little is self-evident in the trademark infringement field. Defendant may mean that the mark is weak because it is merely "descriptive", as opposed to being "suggestive" or "arbitrary or fanciful". *See Hasbro, supra,* 858 F.2d at 73–75 (holding that "GUNG–HO" is a suggestive trademark); *Banff, supra,*

841 F.2d at 489 (affirming that "Bee Wear" is either suggestive or arbitrary); *see generally Abercrombie & Fitch v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976). While INTERVIEW does appear to convey "an immediate idea of the ingredients, qualities or characteristics of the [magazine]", *Hasbro, supra,* 858 F.2d at 73 (citation omitted), thus making the mark a "weak" one by definition, "a mark's category is not alone controlling". *Centaur Communications, supra,* 830 F.2d at 1226; *see also Banff, supra,* 841 F.2d at 491.

The evidence supports a finding that plaintiff's trademark INTERVIEW, in its characteristic script, is a strong mark. The magazine has over a million subscribers and receives over three million dollars a year in advertising revenue. *Cf. Centaur Communications, supra,* 830 F.2d at 1219 (magazines in question each had subscription base of less than 50,000). In addition, plaintiff promotes its trademark through sales, in an unspecified amount, of various products. The Court thus has little trouble concluding that the trademark INTERVIEW is a relatively strong mark, suggesting to purchasers a product of distinct origin.

Defendant argues, however, that the extensive use of the word "interview" as a section heading in various publications weakens plaintiff's mark significantly. For support, defendant urges that "an otherwise strong mark may be diminished by evidence of unchallenged third-party use of the mark." *Lambda Electronics Corp. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 925 (S.D.N.Y.1981). Plaintiff, on the other hand, urges that third-party infringement of a trademark is irrelevant. *See Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 614 (7th Cir.1965); *Dunfey Hotels Corp. v. Meridien Hotels Investments Group, Inc.,* 504 F.Supp. 371, 380 (S.D.N.Y.1980). While the issue is not settled, it appears that third-party use or infringement cannot be raised by an alleged infringer as a defense or excuse, but may be considered in determining the likelihood of confusion. *See Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 505 (5th

Cir.) (court considered third parties' usage in weighing likelihood of confusion), *cert. denied,* 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979). This approach appears to have been used in *Kinark Corp. v. Camelot, Inc.,* 548 F.Supp. 429 (D.N.J. 1982), a case plaintiff contends supports its argument. In *Kinark,* the court decided that plaintiff's "lack of consistent effort to prevent others from using the mark ... has no bearing on the rights of the parties before the court." *Id.* at 443. The court reached this conclusion in rejecting defendant's claimed defense of abandonment.[4] Later in the opinion, however, the court rejected the conclusion reached in *Tisch, supra,* that use of a trademark by third parties had no bearing on likelihood of confusion. *Id.* at 447; *see J.M. Huber Corp. v. Lowery Wellheads, Inc.,* 778 F.2d 1467, 1471 (10th Cir.1985) ("It is no defense to an action for trademark infringement that third parties are also infringing the plaintiff's trademark. (citation omitted). However, the evidence of which [plaintiff] complains is relevant to the question whether there is a 'likelihood of confusion'. (citation omitted).") The Court will thus consider third-party uses in evaluating the strength of the mark.

It is uncontested that other periodicals have interview sections identified by an "interview" heading similar to that used in *Time.* These publications, combined, have at least as wide a circulation as plaintiff's magazine. The extensive use of these marks weakens plaintiff's claim that purchasers of *Interview* might believe that it is associated with *Time* or Time Incorporated. Nonetheless, this point is not dispositive on the likelihood of confusion issue, especially since *Time* has such an extensive circulation and reputation.

### 2. Similarity Between the Marks

In viewing the similarity of the marks, the Court is concerned with the "general impression conveyed to the purchasing public by the respective marks" when the two marks are viewed separately. *Centaur Communications, supra,* 830 F.2d at 1226;

see also *Banff, supra,* 841 F.2d at 492. "Ultimately, the crucial question is whether the similarity is likely to create confusion." *Hasbro, supra,* 858 F.2d at 77 (citing *McGregor–Doniger, supra,* 599 F.2d at 1133)). On the one hand, the word "interview" as used by plaintiff and defendant is identical. On the other hand, plaintiff's mark INTERVIEW is completely different than the roman-type print used by *Time.* In addition, plaintiff's mark appears on the cover, and spine, whereas defendant's use of the word appears only in the table of contents and as a section heading. By contrast, plaintiff does not, according to the facts before the court, use "interview" as a section heading. Based on these facts, the Court concludes that plaintiff's use of INTERVIEW and defendant's use of "interview" are not similar to a degree that would cause consumer confusion.

### 3. Proximity of the Products

This third factor is concerned with the potential that purchasers may be confused as to the source of the goods due to the commercial, or competitive, proximity of the products. *Hasbro, supra,* 858 F.2d at 77; *Centaur Communications, supra,* 830 F.2d at 1226. Plaintiff argues that since both *Time* and *Interview* compete for the same reading public and advertisers, the competitive proximity of the products is strong. Defendant of course acknowledges that both marks are used on magazines, though, as noted above, stresses the different contexts in which the marks are used. The two products are both in the same general field, communications, and the same general medium, magazines, and thus have a level of competitive proximity. Nonetheless, the fact that the marks are used in different ways, and that defendant is using "interview" in a way similar to many other periodicals and distinct from plaintiff, weakens any finding of competitive proximity.

The only area of potential confusion as to source stems from the possibility that a purchaser of *Interview* might believe that the magazine is connected to Time Incorpo-

---

**4.** The Court has reached the same conclusion in     this case.

rated since *Time* has an interview section. This possibility reflects plaintiff's reverse confusion argument. Though the marks are not particularly similar, plaintiff argues that *Time* has taken section headings, such as "People" and "Money" and turned them into independent magazines under the same name. Although the Court does not believe, as stated below, that defendant will "bridge the gap" by publishing its own *Interview* magazine, there is some potential that a consumer who knew that *People* or *Money* are published by Time Incorporated and that *Time* magazine has similar sections under the same name. This possibility, not supported by any empirical evidence, is not in the Court's view overwhelming since there is no indication that purchasers of *People* or *Money* know that Time Incorporated publishes them or that *Interview* purchasers know this fact such that they will assume that Time publishes *Interview*. This factor thus tilts only slightly in plaintiff's favor.

### 4. Likelihood that Defendant will Bridge the Gap

The fact that two products operate in the same market increases the likelihood of confusion. *Hasbro, supra,* 858 F.2d at 78. The more closely the products compete, the shorter the gap; if the products on which the marks appear are identical there is simply no gap to bridge. *See Banff, supra,* 841 F.2d at 492. Less proof is necessary to establish likelihood of confusion when the goods are in competition. *Id.* In this case, there is a gap to bridge since plaintiff publishes a magazine called *Interview* whereas defendant publishes a magazine under a different name that includes within it a section called "Interview"; the goods, and the use of the mark, are not identical. Plaintiff argues that defendant may bridge the gap since Time Incorporated has in the past spun off new magazines out of sections in *Time*. The Court recognizes this possibility. Nonetheless, Time Incorporated has not spun off magazines for all or even most of the section headings in *Time*. It does not publish an *Art* maga-

zine nor *Travel* nor *Music*. Indeed, another company publishes a periodical called *The Nation,* similar in name to *Time*'s "Nation" section. It is true that defendant publishes a number of magazines with simple, common-place names, such as *People* and *Money,* but that fact does not necessarily establish that defendant will begin to publish its own *Interview*. On the whole, the likelihood that defendant will bridge the gap weighs only slightly in plaintiff's favor.[5]

### 5. Actual Confusion

Plaintiff, on the basis that *Time*'s "interview" section is new, offered no evidence to indicate actual confusion. Of course, the proof of actual confusion is not necessary, though it is highly probative, to a finding of likelihood of confusion. *See Banff, supra,* 841 F.2d at 492. Defendant acknowledges this proposition, but argues that the Court should infer that no such proof could exist since plaintiff has not shown actual confusion between other magazines' use of an interview section and plaintiff's *Interview*. While such proof may have been probative, the Court will not view its absence as probative. *See Centaur Communications, supra,* 830 F.2d at 1227 (absence of proof of actual confusion not significant when goods in competition only a few months).

### 6. Good Faith

None of the evidence supports a finding of bad faith. Defendant claims to have chosen the section-heading for its descriptive value. The fact that, prior to the commencement of the lawsuit, defendant did not abandon its project at plaintiff's suggestion, does not itself evidence a lack of good faith. Accordingly, this factor weighs neither in favor nor against a finding of likelihood of confusion.

### 7. Quality of Junior User's Product

Plaintiff does not question the high quality of defendant's product. Defendant sug-

---

**5.** The complexion of this application would be radically different, of course, it defendant were in fact to bridge the gap, but that issue is not now before the Court.

gests that its product is of higher quality, a fact which might be to plaintiff's advantage, but plaintiff is content with stating that the products are of equally high quality. Without deciding this dispute, the Court notes that a "lack of marked difference in quality between goods supports the inference that they emanate from the same source." *Centaur Communications, supra,* 830 F.2d at 1228.

### 8. Sophistication of the Buyers

The parties agree that consumers of magazines such as these are relatively similar. Plaintiff, without factual support, contends that the average consumer would not be sophisticated enough to distinguish between the products of plaintiff and products of defendant, whereas defendant reaches the contrary conclusion. The Court is not in a position to guess about the customers' sophistication, but will state that it is not likely that the average consumer would know that magazines such as *People* or *Money* are published by Time Incorporated.[6] Under other circumstances, this lack of sophistication might suggest a likelihood of confusion. *See Hasbro, supra,* 858 F.2d at 79. Nonetheless, the lack of concrete evidence precludes giving this factor much weight. *Id.* In addition, the inability of the average consumer to associate these magazines with defendant suggests that these same consumers would not believe that defendant published plaintiff's magazine.

### 9. Conclusion

On balance, plaintiff has not established a likelihood of confusion in this case. Although the INTERVIEW mark is relatively strong, defendant is not using that mark, but instead, a less distinct variation of the same word. The marks do not look alike, nor are they used in the same fashion. Third-party uses, which are present in this case, diminish the claim for likelihood of confusion. Of most importance, plaintiff has not established that the average pur-

chaser is likely to believe that *Interview* is associated with *Time* simply because *Time* has a section called "Interview". Other periodicals have similar sections, and plaintiff has not established that average purchasers of these products know that *Time* spinoffs such as *People* or *Money* are in fact associated.

### b. *Fair Use Defense*

■ In the alternative, defendant argues that its use of "interview" qualifies for the good faith exception in the Lanham Act, section 33(b)(4), codified at 15 U.S.C. § 1115(b)(4):

> ... the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, ... of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party ...

This defense is applicable to defeat plaintiff's claim of incontestability under 15 U.S.C. § 1065. *See Abercrombie & Fitch, supra,* 537 F.2d at 12; *Eli Lilly & Co. v. Revlon, Inc.,* 577 F.Supp. 477, 485–86 (S.D.N.Y.1983). As a preliminary matter, plaintiff claims that defendant uses INTERVIEW as a mark. The Court disagrees. First, there is no evidence to suggest that defendant has ever used plaintiff's stylized INTERVIEW mark. Second, defendant uses "interview" to designate a section in a magazine, not as a trademark. The statute defines a trademark as a

> word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured and sold by others and to indicate the source of goods, even if that source is unknown.

15 U.S.C.A. § 1127 (Supp.1988). Defendant does not use "interview" to identify or distinguish its goods from any others.

---

**6.** Plaintiff's argument on reverse confusion would be stronger if it had produced evidence to show that consumers associate *People* or *Money* with *Time* or Time Incorporated, since the Court could infer from that fact that these same consumers might believe that *Interview* was similarly associated. No such proof has been presented.

The next question to answer is whether the term is used in good faith to describe the goods or services. As indicated in the discussion above, "interview" as used by defendant is descriptive of the contents of that section of the magazine. Defendant claims to have chosen the "interview" for its simplicity and descriptiveness, indicating good faith, and plaintiff has not indicated any lack of good faith. Accordingly, the Court concludes that, notwithstanding a lack of likelihood of confusion, defendant would be entitled to a "fair use" defense.

#### c. Anti-dilution Claim

■ Plaintiff also makes a claim for injunctive relief on the basis of New York's anti-dilution statute, New York General Business Law, § 368–d, which states:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Confusion and direct competition are not necessary elements. *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 624 (2d Cir.1983). The anti-dilution statute protects not only commercial goodwill, but also the selling power associated with a distinctive name. *Id.* Plaintiff's dilution claim, however, is not viable.[7]

The New York Court of Appeals has stated that in order to merit protection under the anti-dilution statute a trademark must be "truly distinctive" or have acquired secondary meaning. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632–33, 369 N.E.2d 1162, 1166–67 (1977). For purposes of the anti-dilution statute, "distinctive" trademarks are those which are unique and which are not generic or descriptive. *P.F. Cosmetique, S.A. v. Minnetonka Inc.,* 605 F.Supp. 662, 672 (S.D.N.Y. 1985). The word "interview" used by defendant is not "distinctive" for anti-dilution purposes, and thus does not warrant protection. Defendant has not used the more distinctive INTERVIEW mark, and the Court need not decide whether use of that trademark would implicate the anti-dilution statute. Based on this lack of distinctiveness, the Court finds that plaintiff is not likely to succeed on the anti-dilution claim.[8]

#### II. Serious Issues for Litigation and Balance of Hardships

The Court does not find that there are serious issues for litigation warranting the issuance of a preliminary injunction. Defendant is not using the INTERVIEW trademark, but only the word "interview" as a descriptive section heading. Other magazines use the word in a similar fashion. It is unlikely that consumers will come to believe that *Interview,* with its distinct format and cover, is associated with *Time* or Time Incorporated. For these reasons, the Court concludes that the

---

**7.** As a preliminary matter, plaintiff's product, on which its mark appears, competes with defendant's product. The New York Court of Appeals has stated that "[t]he evil which the Legislature sought to remedy was not public confusion caused by similar products ... sold by competitors, but a cancer-like growth of dissimilar products ..." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977), *cited in Sally Gee, supra,* 699 F.2d at 624. This Court recently decided that "relief is not available under the anti-dilution statute where the infringement claimed is by a direct competitor selling a similar product", and on that basis dismissed an anti-dilution claim. *Business Trends Analysts, supra,* 650 F.Supp. at 1458. The Court does not base its decision on this basis, however, since this issue has not been fully developed in the parties' papers.

**8.** Although the anti-dilution statute protects marks which have gained secondary meaning, plaintiff has not submitted any evidence on this point. Such an effort would most likely be fruitless since "interview" is so descriptive by nature. Additionally, plaintiff has not established that defendant's use will either "tarnish" or "blur" the INTERVIEW trademark. Plaintiff would have to prove that the "product-evoking quality of its marks were likely to be weakened by use of the ..." "interview" section heading, *Sally Gee, supra,* 699 F.2d at 626, something plaintiff has not done.

balance of hardships does not tip decidedly in plaintiff's favor.

## CONCLUSION

For the reasons stated above, plaintiff's application for a preliminary injunction is denied.

SO ORDERED.